**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

FRANCISCO JAVIER GUZMAN CHAVEZ,

      Plaintiff,

vs.                                                                                  No. 1:19-CV-00341-KRS

ANDREW SAUL, Commissioner of
Social Security Administration,

      Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court upon Plaintiff's Motion to Reverse and Award Benefits, or for Rehearing, with Supporting Memorandum (Doc. 20), dated October 1, 2019, challenging the determination of the Commissioner of the Social Security Administration ("SSA") that Plaintiff is not entitled to disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-34. The Commissioner responded to Plaintiff's motion on December 27, 2019 (Doc. 25), and Plaintiff filed a reply brief on January 10, 2020 (Doc. 26). With the consent of the parties to conduct dispositive proceedings in this matter, *see* 28 U.S.C. § 636(c); FED. R. CIV. P. 73(b), the Court has considered the parties' filings and has thoroughly reviewed the administrative record. Having done so, the Court concludes that the Commissioner erred in his decision and will therefore GRANT Plaintiff's motion.

### I. PROCEDURAL POSTURE

On November 14, 2015, Plaintiff filed an initial application for disability insurance benefits. (*See* Administrative Record ("AR") at 268). Plaintiff alleged that he had become disabled on April 29, 2013, due to chronic migraines; chronic neck, back, and right shoulder pain; memory loss; type 2 diabetes; a sleep disorder; and chronic fatigue. (*Id.* at 268, 430, 433).

His application was denied at the initial level on August 18, 2016 (*id.* at 268-93),[1] and at the reconsideration level on March 1, 2017 (*id.* at 294-316, 321). Plaintiff requested a hearing (*id.* at 328-29), which ALJ Lillian Richter (the "ALJ") conducted on March 20, 2018 (see *id.* at 217-48). Plaintiff was represented by counsel and testified at the hearing. (*Id.* at 217, 222-43). Vocational expert Cindy Harris (the "VE") also testified at the hearing. (*Id.* at 244-47).

On July 12, 2018, the ALJ issued his decision, finding that Plaintiff was not disabled under the relevant sections of the Social Security Act. (*Id.* at 16-30). Plaintiff requested that the Appeals Council review the ALJ's decision (*id.* at 39-41), and on February 15, 2019, the Appeals Council denied the request for review (*id.* at 1-9), which made the ALJ's decision the final decision of the Commissioner. On April 12, 2019, Plaintiff filed the complaint in this case seeking review of the Commissioner's decision. (Doc. 1).

## II.  LEGAL STANDARDS

### A.  Standard of Review

Judicial review of the Commissioner's decision is limited to determining "whether substantial evidence supports the factual findings and whether the ALJ applied the correct legal standards." *Allman v. Colvin*, 813 F.3d 1326, 1330 (10th Cir. 2016); *see also* 42 U.S.C. § 405(g). If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands, and the plaintiff is not entitled to relief. *See, e.g.*, *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). Although a court must meticulously review the entire record, it may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *See, e.g.*, *id.* (quotation omitted).

---

[1] Plaintiff's claim was originally approved at the initial level, but further review spurred corrective action by the state agency due to a purported documentation deficiency concerning a potential medical vocational allowance. (*See, e.g.*, *id.* at 486, 491).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation omitted); *Langley*, 373 F.3d at 1118 (quotation omitted). Although this threshold is "not high," evidence is not substantial if it is "a mere scintilla," *Biestek*, 139 S. Ct. at 1154 (quotation omitted); "if it is overwhelmed by other evidence in the record," *Langley*, 373 F.3d at 1118; or if it "constitutes mere conclusion," *Grogan v. Barnhart*, 399 F.3d 1257, 1261-62 (10th Cir. 2005) (quotation omitted). Thus, the Court must examine the record as a whole, "including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan*, 399 F.3d at 1262. While an ALJ need not discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence," and "a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). "Failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir. 1984) (quotation omitted).

### B.  Disability Framework

"Disability," as defined by the Social Security Act, is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); *Wall v. Astrue*, 561 F.3d 1048, 1051-52 (10th Cir. 2009); 20 C.F.R. §§ 404.1520, 416.920. If a finding of disability or non-disability is directed at any point,

the SSA will not proceed through the remaining steps. *Thomas*, 540 U.S. at 24. At the first three steps, the ALJ considers the claimant's current work activity and the severity of his impairment or combination of impairments. *See id.* at 24-25. If no finding is directed after the third step, the Commissioner must determine the claimant's residual functional capacity ("RFC"), or the most that he is able to do despite his limitations. *See* 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). At step four, the claimant must prove that, based on his RFC, he is unable to perform the work he has done in the past. *See Thomas*, 540 U.S. at 25. At the final step, the burden shifts to the Commissioner to determine whether, considering the claimant's vocational factors, he is capable of performing other jobs existing in significant numbers in the national economy. *See id.*; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

### III.  THE ALJ'S DETERMINATION

The ALJ reviewed Plaintiff's claim pursuant to the five-step sequential evaluation process. (AR at 17-18). She first determined that Plaintiff had not engaged in substantial gainful activity since his onset date. (*Id.* at 18).[2] She then found that Plaintiff suffered from the following severe impairments: degenerative joint disease in the great toe; degenerative disc disease in the cervical and lumbar spine with radiculopathy; chronic pain syndrome; right-foot plantar fasciitis; rotator cuff tendinopathy; acromioclavicular joint arthritis; high-frequency sensorineural hearing loss; enucleation and anophthalmos revision on the left; sleep disorder; somatic symptom disorder; post-traumatic stress disorder; major depressive disorder with psychosis; adjustment disorder; chronic migraines; and varicose veins. (*See id.* at 18-19). The ALJ also found that

---

[2] The ALJ also found that Plaintiff met the SSA's insured-status requirements through December 31, 2018. (*See id.*). The parties note this fact, as well as the fact that a subsequent application for disability insurance filed by Plaintiff was approved the day after the ALJ's denial at issue in this case. (*See, e.g.*, Doc. 25 at 1 n.1; Doc. 26 at 1 & n.1). Plaintiff does not directly allege any legal error relating to these matters.

4

Plaintiff suffered from the following non-severe impairments: bunions; impairment of the urethral stricture; encephalopathy; and untreated, non-medically determinable dizziness and loss of consciousness. (*Id.* at 19).

At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments which met the criteria of listed impairments under Appendix 1 of the SSA's regulations. (*Id.* at 19-20). In so holding, the ALJ found that Plaintiff possessed only moderate limitations in each of the four broad areas of functioning (understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing himself), meaning that Plaintiff did not satisfy the "paragraph B" criteria of sections 12.04, 12.07, and 12.15 of Appendix 1. (*Id.* at 20). The ALJ repeatedly cited and referred to the findings of consultative psychiatric examiner Paula Hughson, M.D. (the "CE") in formulating these findings. (*See id.*).

Proceeding to the next step, the ALJ reviewed the evidence of record, including medical opinion evidence from the CE, evidence from other medical and non-medical sources, and Plaintiff's own subjective symptom evidence. (*See id.* at 21-28). Based on her review of this record evidence, the ALJ concluded that Plaintiff possessed an RFC to perform "a limited range of work at the medium exertional level" with certain alterations. (*Id.* at 21). Moving to step five, the ALJ cited testimony from the VE, who testified that Plaintiff was unable to perform any past relevant work but could perform other jobs existing in significant numbers in the national economy. (*See id.* at 28-30). The ALJ therefore concluded that Plaintiff's work was not precluded by his RFC and that he was not disabled. (*See id.* at 30).

5

## IV. DISCUSSION

Plaintiff challenges the ALJ's weighting of the opinions expressed by the CE, Dr. Hughson, as well as other purported errors. (*See* Doc. 20 at 10-26). Because the Court concludes that the ALJ did not follow proper legal standards in weighting the CE's opinions and did not support that weighting with substantial evidence, the Court does not reach Plaintiff's additional claims of error. *See, e.g.*, *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

In her report, the CE discussed Plaintiff's self-reported symptoms, recorded her mental status examination findings, diagnosed Plaintiff with several conditions, and provided an opinion concerning Plaintiff's abilities and impairments. (AR at 1094-1100). In particular, the CE assessed Plaintiff with the following psychiatric limitations:

- a moderate limitation in understanding and remembering detailed or complex instructions;
- a marked limitation in carrying out instructions;
- a moderate-to-marked limitation in attending and concentrating;
- a mild-to-moderate limitation in working without supervision;
- a moderate-to-marked limitation in interacting with the public;
- a moderate limitation in adapting to changes in the workplace; and
- a moderate-to-marked limitation (due to physical impairments) in using public transportation or traveling to unfamiliar places.

(*Id.* at 1100). The CE found only mild limitations in other functional abilities. (*See id.*). The CE also made certain findings concerning Plaintiff's ability to physically perform his former work or other physical work. (*See id.* at 1098-99).

The ALJ afforded "little weight" to the CE's opinions. (*See id.* at 26-27). She concluded that the CE's opinions concerning Plaintiff's mental conditions were inconsistent with the fact that Plaintiff had sought out and received "little treatment" for these symptoms. (*See id.* at 26).

The ALJ also held that the CE's opinions concerning Plaintiff's psychiatric and physical limitations were unsupported by her mental status examination, were based in part on Plaintiff's subjective reports of his symptoms, and were therefore inconsistent with her objective findings and other evidence concerning his physical condition. (*See id.* at 26-27). Plaintiff argues that the ALJ's reasoning is inconsistent with the record and that the ALJ improperly substituted her own judgment for that of the CE. (*See* Doc. 20 at 12-15). The Commissioner argues that the ALJ's weighting of the CE's opinion was pursuant to proper legal standards and supported by substantial evidence. (*See* Doc. 25 at 10-13).

"[I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). This rule itself leads to two further corollaries. First, "[i]t is improper for the ALJ to pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence." *Carpenter v. Astrue*, 537 F.3d 1264, 1265 (10th Cir. 2008) (quotation omitted); *see also Panas ex rel. M.E.M. v. Comm'r, SSA*, 775 F. App'x 430, 437 (10th Cir. 2019) (unpublished) (noting relationship between *Clifton* and the rule against picking and choosing among medical reports). Second, and relatedly, the ALJ is not permitted to "mischaracterize or downplay evidence to support her findings." *Bryant v. Comm'r, SSA*, 753 F. App'x 637, 641 (10th Cir. 2018) (unpublished) (citing *Talbot v. Heckler*, 814 F.2d 1456, 1463-64 (10th Cir. 1987)). Rather, an ALJ must provide "appropriate explanations for accepting or rejecting" medical opinions. *See* SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996). An ALJ's failure to appropriately explain why she adopted some of a CE's restrictions but rejected others amounts to legal error. *See Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007).

In unpublished caselaw, the Tenth Circuit has acknowledged that "[t]he practice of psychology is necessarily dependent, at least in part, on a patient's subjective statements." *See Thomas v. Barnhart*, 147 F. App'x 755, 759 (10th Cir. 2005) (unpublished). Moreover, "a consulting, examining physician's testimony is normally supposed to be given more weight than a consulting, non-examining physician's opinion." *Id.* at 760 (citing *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004)). As such, "[t]he ALJ cannot reject [a CE's] opinion *solely* for the reason that it was based on [a claimant's] responses because such rejection impermissibly substitutes [the ALJ's] judgment for that of [the CE]." *Id.* (citing *Winfrey v. Chater*, 92 F.3d 1017, 1022 (10th Cir. 1996)) (emphasis added). Trial courts therefore routinely reject an ALJ's substitution of her own "lay speculation and assumptions" where an examining medical provider's contrary opinion was "supported by tests, evaluations, and reports." *See, e.g.*, *Garcia v. Berryhill*, No. CV 16-1034 CG, 2017 WL 3328184, at *4 (D.N.M. Aug. 3, 2017) (finding reversible error where ALJ assigned only "partial weight" to examining provider's opinions concerning severity of limitations and instead concluded from her own observations that claimant "appeared capable in most social situations").

On the other hand, "*Thomas* does not stand for the proposition that an ALJ cannot, in determining *what weight to assign an opinion*, consider that the opinion is based on subjective information provided by the claimant." *Houston v. Colvin*, 180 F. Supp. 3d 877, 888 (D.N.M. 2016) (citing 147 F. App'x at 759-60). "Although the ALJ cannot substitute his judgment for that of a psychiatrist, the Tenth Circuit has not forbidden an ALJ from considering information unavailable to the psychiatrist that discredits the subjective statements on which the psychiatrist relied." *Id.* Therefore, as long as the ALJ's weighting of a CE's opinion otherwise finds support in the record as a whole, that weighting should not be disturbed simply because the ALJ also

took note of the fact that the opinion depended in part on the claimant's subjective statements. *See id.* at 888-89 (rejecting challenge to weighting of CE opinion where RFC was consistent with other medical and non-medical evidence); *see also, e.g.*, *Vigil*, 805 F.3d at 1202-03 (finding no error where ALJ considered "all of [the CE's] medical evidence, as well as the record as a whole, and gave good reasons for the weight he afforded [the CE's] opinions"); *Cindy S.C. v. Saul*, Civ. A. No. 18-1307-JWL, 2019 WL 3943065, at *7 (D. Kan. Aug. 21, 2019) ("[I]f an ALJ could not discount a medical opinion based on a fact the psychologist had already considered when formulating his opinion, that would be tantamount to taking away the Commissioner's duty to weigh the medical opinion . . . .").

Somewhat more problematic is the ALJ's decision to discount the CE's findings due to an absence of evidence that Plaintiff previously sought treatment for his symptoms. The absence of sufficient evidence concerning a claimant's mental impairment is a primary reason for requiring a consultative examination in the first place. *See* 20 C.F.R. § 404.1519a(b). As Plaintiff suggests, the Commissioner's decision to require Plaintiff to undergo a consultative examination due to a lack of evidence concerning his mental impairments, only to discount the CE's opinion based on the same lack of evidence concerning mental impairments, is questionable.[3] Nevertheless, SSA regulations direct that an opinion's inconsistency with the medical record as a whole is a valid factor to consider when weighing that opinion. *See* 20 C.F.R. § 404.1527(c)(4) (providing that an ALJ weighing medical evidence must consider, among other things, the "consistency" of an opinion with "the record as a whole").

---

[3] This is especially the situation in this case, where the SSA *expressly* required the state agency to procure a consultative psychiatric examination precisely because of evidentiary deficiencies concerning Plaintiff's alleged psychiatric limitations. (*See, e.g.*, AR at 486-88) (June 28, 2016 directive ordering corrective action due to the need for "a current mental status examination" and for "additional information . . . about the allegation of memory loss and the impact of symptoms on the claimant's behavior and functioning").

The problem here is that the ALJ's conclusion that Plaintiff received "little treatment" for the mental impairments addressed by the CE (*see* AR at 22) is *itself* inconsistent with the record. The CE suggested that Plaintiff's mental impairments, particularly his chronic sleep disorder and hallucinations, bore a significant relationship to the limitations that she found:

> I got the impression from his behavior during the interview, that there is an element of dissociation at play . . . . The nightmares and hypnagogic and hypnopompic hallucinations he experiences are probably part of that, and also related of course to his chronic sleep disorder. Mr. Guzman's physical problems are very real and the chronic fatigue and body pain associated with chronic sleep deprivation, not to mention the recurring headaches, quite debilitating.

(AR at 1098) (typographical punctuation error omitted); (*see also* Doc. 20 at 13-14) (addressing Plaintiff's mental impairments and CE's findings relating impairments to sleep disorder). Here, contrary to the ALJ's conclusion, the record illustrates that Plaintiff has been receiving treatment for several years for his sleep disorder, associated hallucinations, and other psychiatric conditions found by the CE.

Plaintiff's most significant recent medical history begins in early 2013, after he purportedly suffered an injury while performing mechanic work. (*See, e.g.*, AR at 698). Although Plaintiff regularly asserted a relationship between his resulting shoulder pain and his sleep issues (*see, e.g.*, *id.* at 677) (September 2013), he also described certain psychiatric circumstances contributing to sleep loss—for which he received a prescription—as early as March 2013 (*see, e.g.*, *id.* at 692-93). Plaintiff continued to be treated for chronic sleep problems throughout 2013. (*See id.* at 689) (May); (*id.* at 683) (July); (*id.* at 680) (August); (*id.* at 677) (September). Throughout 2014, Plaintiff's medical providers continued to note his sleep disorder and to treat it with medication. (*See, e.g.*, *id.* at 670) (February); (*id.* at 667-68) (April). These providers treated his sleep disorder as a psychiatric matter for much of this period (*see, e.g.*, *id.* at

10

677, 693), while also noting other periodic psychiatric issues such as anxiety and depression (*see, e.g.*, *id.* at 667-68, 669, 670, 677, 689, 692-93).

Plaintiff drew a more direct connection between his sleep disorder and other psychiatric issues beginning in January 2015, when he told his provider that he had been hearing non-command auditory hallucinations for the past three years. (*See id.* at 662). Plaintiff reported that these hallucinations were most prominent when he was falling asleep at night, but he also claimed to sometimes hear them while awake in bed and even during the day. (*See id.*). Plaintiff's provider noted a differential for primary psychotic disorder, depression with psychotic features, and/or lucid dreams, but she ultimately concluded that the etiology was unclear. (*See id.*). In an examination the following month, Plaintiff stated that the hallucinations had been increasing in recent years, claiming that he hears some voices in dreams and other voices as he falls asleep. (*Id.* at 659). His provider diagnosed hypnagogic hallucinations and noted dizziness and loss of consciousness that appeared to be related to Plaintiff's migraines. (*Id.* at 659-60). Later in 2015, Plaintiff's provider prescribed amitriptyline to help with his sleep disorder and resulting depression, and she recommended that he seek psychological support from a Dr. Gray. (*Id.* at 654). When Plaintiff later reported ceasing the use of amitriptyline due to side effects, his provider prescribed citalopram and referred him for a January 2016 psychological appointment with Dr. Gray. (*Id.* at 652).

Although Plaintiff did not appear for his appointment with Dr. Gray,[4] he continued to receive treatment for his insomnia and other psychiatric issues from his primary care providers and remained on citalopram. (*See, e.g.*, *id.* at 636) (November 2015); (*id.* at 1168-69) (May 2016); (*id.* at 1115-16) (October 2016); (*see also id.* at 1324) (noting "[s]ome treatment of

---

[4] Plaintiff and his spouse reported in July 2016 that Plaintiff "ha[d] no knowledge of being referred to Dr. Gray" and that Plaintiff had not yet visited a psychiatric specialist due to a lack of insurance. (*See* AR at 489).

11

depression by [primary care provider]" prior to August 2017). Plaintiff's August 2016 examination by the CE, in which he described his sleep problems, his non-command auditory hallucinations, and his medication regimen for psychiatric issues, reveals allegations that are largely consistent with the symptoms he described to (and was treated for by) his primary care providers during that period. (*See, e.g.*, *id.* at 1096-97) (describing insomnia, nightmares, "sleep-related auditory hallucinations," and ongoing use of amitriptyline and citalopram).

In August 2017, after Plaintiff alleged worsening auditory hallucinations, his primary care provider referred him to Christine M. Clark, M.D., a psychiatric consultant at U.N.M. Health Sciences Center. (*See id.* at 1324-26, 1346). Plaintiff revealed to Dr. Clark on that date that his auditory hallucinations had worsened and that they were "now command in nature at times." (*Id.* at 1325). Plaintiff noted that he was no longer taking amitriptyline and that he had self-discontinued his citalopram prescription a month or two earlier. (*See id.* at 1324). Plaintiff also now described "visual hallucinations of shadows." (*Id.*). Dr. Clark stated that Plaintiff "meets criteria for depression including depressed mood, poor concentration, problems sleeping, anhedonia, suicidal ideations, and feelings of worthlessness," and she observed that "[p]sychotic symptoms are possibly secondary to depression but could constitute a primary thought disorder." (*Id.* at 1325). Dr. Clark consulted with Plaintiff's primary care provider and prescribed Seroquel "to address psychosis and insomnia." (*See id.* at 1325-26, 1347).

Plaintiff's Seroquel prescription for these conditions continued for at least seven months. (*See, e.g.*, *id.* at 1335) (October 2017); (*id.* at 1366) (November 2017); (*id.* at 2010) (February 2018). Although Plaintiff missed a February 2018 appointment with Dr. Clark (*see id.* at 2009), he appeared for another appointment two weeks later, where he reported worsening hallucinations (*see id.* at 2006). Plaintiff in particular described hearing "insulting" and

sometimes "command" voices, visions of "dead people," increased sensitivity to sound, and continued sleep loss. (*See id.*). On a mental status exam, Dr. Clark found that Plaintiff was dysthymic with congruent mood and had impaired judgment and insight. (*Id.* at 2007). Dr. Clark concluded that Plaintiff's "[p]sychotic symptoms including somatic hallucinations/AH[auditory hallucinations]/VH[visual hallucinations] likely constitute a primary thought disorder." (*See id.* at 2008). She prescribed Haldol, an antipsychotic medication, to address Plaintiff's auditory hallucinations, and she contemplated a future prescription for Cymbalta to address Plaintiff's depression. (*See id.*). She observed that Plaintiff was at low risk for suicide, violence, or homicide, but she warned that these risks would increase if Plaintiff did not follow-up with appointments or comply with his psychiatric treatment. (*See id.*).

The foregoing discussion demonstrates that the ALJ improperly mischaracterized the nature and extent of Plaintiff's treatment for his somatic symptom disorder, sleep disorder, and related impairments. (*See* AR at 26). Far from amounting to "little treatment" for these conditions as the ALJ stated (*see id.*), and far from showing that Plaintiff "eschew[ed] mental health treatment" as the Commissioner now asserts (*see* Doc. 25 at 12), the record reflects that Plaintiff received *extensive* treatment from his primary care providers and psychiatric professionals for the very mental health and related conditions assessed by the CE. (*See id.* at 1094-1100). Although the ALJ was required to consider the consistency of the CE's findings with the record as a whole, *see* 20 C.F.R. § 404.1527(c)(4), she was not permitted to "mischaracterize or downplay" that record in the process. *See Bryant*, 753 F. App'x at 641. By doing so here, the ALJ effectively engaged in improper "picking and choosing" from among the medical findings of record, relying only on those "portions of evidence favorable to [her] position while ignoring other evidence." *See Carpenter*, 537 F.3d at 1265.

13

In fact, the ALJ's mischaracterization of the record as it relates to the CE's report precedes even her RFC findings. At step three, the ALJ relied "primarily" on Plaintiff's "subjective allegation that he experiences command hallucinations" to conclude that he has a limitation in interacting with others; however, she assessed only a "moderate" limitation in this area, in part because "treatment notes show that the claimant . . . did not report *these* hallucinations during his consultative examination." (*See* AR at 20) (emphasis added). The implication is that Plaintiff's present claim concerning the *command* nature of his auditory hallucinations is inconsistent with his allegations of *non-command* hallucinations to the CE in August 2016. (*See id.* at 20, 1098). In fact, though, the record reflects that Plaintiff was similarly reporting only non-command auditory hallucinations to his providers around the time of the CE's examination (*see, e.g.*, *id.* at 659-60), whereas he first complained to his providers about command hallucinations in mid-2017, *approximately one year later*. (*See id.* at 1325) (noting that Plaintiff's auditory hallucinations had recently worsened and were "now command in nature at times"). When viewed properly, the record shows that Plaintiff's statements to the CE concerning his auditory hallucinations were *consistent* with his contemporaneous statements to other providers about that condition, even if he subsequently described a worsening condition to those providers. The ALJ's implication to the contrary is a misrepresentation of the evidence.

Because the ALJ impermissibly mischaracterized Plaintiff's treatment record and misleadingly downplayed medical evidence that was substantially consistent with the CE's opinions, her weighting of the CE's report failed to adhere to the relevant legal standards and is not supported by substantial evidence. *See, e.g.*, *Bryant*, 753 F. App'x at 641; *Carpenter*, 537 F.3d at 1265. Accordingly, Plaintiff's motion is due to be granted, and this matter must be remanded so that the ALJ may properly address the CE's opinions.

## V.  CONCLUSION

The ALJ erred in her review of Plaintiff's application for disability insurance benefits by failing to properly weigh the CE's opinions pursuant to controlling legal standards and by failing to support that weighting with substantial evidence. Accordingly, Plaintiff's Motion to Reverse and Award Benefits, or for Rehearing (Doc. 20) is **GRANTED**, and the Court remands this case back to the SSA for proceedings consistent with this opinion.

_____
**KEVIN R. SWEAZEA**
**UNITED STATES MAGISTRATE JUDGE**